**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                              |   |                            |
|------------------------------|---|----------------------------|
|                              | : |                            |
| **UNITED STATES OF AMERICA** | : | **Case No.: 22-CR-413-CKK-1** |
|                              | : |                            |
| **v.**                       | : |                            |
|                              | : |                            |
| **DOMINIC BOX,**             | : |                            |
|                              | : |                            |
| **Defendant.**               | : |                            |
|                              | : |                            |

**PARTIES' JOINT MOTION TO CONVERT 6/17/24 TRIAL TO STIPULATED TRIAL**
**AND TO VACATE ALL REMAINING PRE-TRIAL DEADLINES**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and Dominic Box, by and through his counsel, jointly move this Court to convert the currently scheduled June 17, 2024 jury trial to a stipulated trial, and to vacate all remaining pre-trial deadlines in this matter.

The parties have agreed to conduct a stipulated trial in lieu of a traditional trial by jury in order to conserve the Court's and the parties' resources by avoiding the time and effort of putting on a fulsome trial by jury, while also preserving the defendant's appeal rights, among other things.

*Remainder of page intentionally left blank*

\*     \*     \*

Accordingly, the parties respectfully submit the following attachments to this motion: (A) a statement of facts and elements for stipulated trial to which the parties have agreed, and (B) a signed agreement and waiver of jury rights.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

/s/ *Amy C. Collins*                           By: /s/ *Samantha R. Miller*
Amy C. Collins                                      SAMANTHA R. MILLER
D.C. Bar No. 1708316                          Assistant United States Attorney
888 17th Street, NW                            New York Bar No. 5342175
Suite 1200                                            United States Attorney's Office
Washington, D.C. 20006                      For the District of Columbia
(228) 424-0609                                     601 D Street, NW
amy@amyccollinslaw.com                   Washington, D.C. 20530
*Counsel for Dominic Box*                   Samantha.Miller@usdoj.gov

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 22nd day of May 2024, I have served this Joint

Motion upon all parties in this matter through the CM/ECF system.

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530
Samantha.Miller@usdoj.gov

# **Attachment A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
|  | : |  |
| **UNITED STATES OF AMERICA** | : | **Case No.: 22-CR-413-CKK** |
|  | : |  |
| **v.** | : | **18 U.S.C. §§ 1512(c)(2), 2** |
|  | : | **18 U.S.C. § 231(a)(3)** |
|  | : | **18 U.S.C. §§ 1752(a)(1), (a)(2)** |
| **DOMINIC BOX,** | : | **40 U.S.C. §§ 5104(e)(2)(D), (G)** |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## STATEMENT OF FACTS FOR STIPULATED TRIAL

The parties, by and through their undersigned counsel, hereby submit this Statement of Facts for Stipulated Trial.

I.      **Elements of the Charged Offenses.**

   A.   *Count One: Obstruction of an Official Proceeding and Aiding and Abetting.*

The essential elements of the offense of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), each of which the government must prove the following beyond a reasonable doubt, are as follows:

1.   The defendant attempted to or did obstruct or impede an official proceeding;

2.   The defendant intended to obstruct or impede the official proceeding;

3.   The defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and

4.   The defendant acted corruptly.

The government further alleges that the defendant aided and abetted others in committing obstruction of an official proceeding. To satisfy its burden of proving that the defendant aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

1. At least one other person committed obstruction of an official proceeding by committing each of the elements of that offense;

2. The defendant knew that obstruction of an official proceeding was going to be committed or was being committed by at least one other person;

3. The defendant performed an act or acts in furtherance of the offense of obstruction of an official proceeding;

4. The defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging at least one other person in committing the offense of obstruction of an official proceeding; and

5. The defendant did that act or acts with the intent that at least one other person commit the offense of an obstruction of an official proceeding.

Without waiving his ability to challenge this definition on appeal, the defendant agrees for the purposes of this proceeding (i.e., the stipulated trial) that, to act "corruptly," he must use independently unlawful means or act with an unlawful purpose, or both, per the D.C. Circuit's current interpretation. He must also act with "consciousness of wrongdoing." "Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong.

The maximum penalties for Obstruction of an Official Proceeding are:

1. A term of imprisonment of not more than 20 years;

2. A term of supervised release of not more than 3 years;

3. A fine not to exceed $250,000; and

4. A special assessment of $100.

### B. Counts Two and Three: Civil Disorder

To prove that the defendant is guilty of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), the government must prove the following beyond a reasonable doubt:

1. That the defendant committed or attempted to commit any act to obstruct, impede or interfere with any law enforcement officer;

2. That the law enforcement officer was lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder; and

3. That the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

Title 18, United States Code, Section 232(3) defines "federally protected function" as "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof." The term "civil disorder," as defined in Section 232(1), means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.

The maximum penalties for Civil Disorder are:

1. A term of imprisonment of not more than 5 years;

2. A term of supervised release of not more than 3 years;

3. A fine not to exceed $250,000; and

4. A special assessment of $100.

### C. Count Four: Entering and Remaining in a Restricted Building or Grounds.

The essential elements of the offense of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant entered or remained in a restricted building or grounds without lawful authority to do so; and,

2. That the defendant did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. 18 U.S.C. § 1752(c)(1)(B).

The maximum penalties for Disorderly and Disruptive Conduct in a Restricted Building or Grounds are:

1. A term of imprisonment of not more than 1 year;

2. A term of supervised release of not more than 1 year;

3. A fine not to exceed $100,000; and

4. A special assessment of $25.

### D. Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds.

The essential elements of the Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), each of which the government must prove beyond a reasonable doubt, are as follows:

1. That the defendant engaged in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds;

2. That such conduct occurred when, or so that, such conduct, in fact, impeded or disrupted the orderly conduct of Government business or official functions; and

3. That the defendant did so knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions.

The maximum penalties for Disorderly and Disruptive Conduct in a Restricted Building or Grounds are:

1. A term of imprisonment of not more than 1 year;

2. A term of supervised release of not more than 1 year;

3. A fine not to exceed $100,000; and

4. A special assessment of $25.

### *E. Count Six: Disorderly Conduct in a Capitol Building or Grounds.*

The essential elements of the offense of Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds;

2. The defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and

3. The defendant acted willfully and knowingly.

The maximum penalties for Disorderly Conduct in a Capitol Building or Grounds are:

1. A term of imprisonment of not more than 6 months;

2. A term of probation of not more than 5 years;

3. A fine not to exceed $5,000; and

4. A special assessment of $10.

### *F. Count Seven: Parading, Demonstrating, or Picketing in a Capitol Building.*

The essential elements of the offense of Parading, Demonstrating, or Picketing in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(G), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant paraded, demonstrated, or picketed in any of the United States Capitol buildings; and

2. The defendant acted willfully and knowingly.

The maximum penalties for Parading, Demonstrating, or Picketing in a Capitol Building or Grounds are:

1. A term of imprisonment of not more than 6 months;

2. A term of probation of not more than 5 years;

3. A fine not to exceed $5,000; and

4.   A special assessment of $10.

## II.   Statement of Facts for the Charged Offenses.

If the case proceeded to trial, the defendant agrees the government would have elicited the following evidence:

### *Election Certification Process*

1.   The 2020 United States presidential election occurred on November 3, 2020. As of November 7, 2020, the incumbent President Donald J. Trump was projected to have lost the presidential election.

2.   The United States Constitution and federal statutes codify the procedures and dates governing the transfer of presidential power in the United States. The Twelfth Amendment requires presidential electors to meet in their respective states and certify "distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each."

3.   On December 14, 2020, the presidential electors of the Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the 2020 U.S. presidential election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next President and Vice President of the United States.

4.   The Twelfth Amendment also provides that the Vice President "shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." Title 3, Section 15 of the United States Code provides that the United States Congress must convene during a joint session proceeding ("the Joint Session") at 1:00 p.m. "on the sixth day of January succeeding every meeting of the electors," with the Vice President presiding, to count the physical certificates of electoral votes, resolve any objections, certify their

validity, and announce the result ("Certification of the Electoral College vote"). The electoral ballots are sent from the states to the president of the Senate in paper form. Before the Certification of the Electoral College vote, the envelopes containing the certificates are placed into ballot boxes.

### The Attack at the U.S. Capitol on January 6, 2021

5.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

6.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

7.      On January 6, 2021, a Joint Session of the United States Congress convened at the United States Capitol. During the Joint Session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 presidential election, which had taken place on November 3, 2020. The Joint Session began at approximately 1:00 p.m. For the Joint Session, congressional staff carried the ballot boxes containing the Electoral College certificates of vote into the House Chamber. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection, and the ballot boxes were carried back to the Senate Chamber. Vice President Mike Pence was present and presiding, first in the Joint Session, and then in the Senate chamber.

8.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades and "Area Closed" signs were in

place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

9.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the USCP, and the crowd advanced to the exterior façade of the building. This crowd numbered far more than three people, and engaged in acts of violence that injured law enforcement officers and damaged U.S. government property. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials.

10.     At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

11.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the Joint Session, were effectively suspended until shortly after 8:00 p.m. the same day.

12.     As they evacuated, members of the Senate staff had to remove the certificates of vote from the Senate Chamber for safekeeping. A member of the House of Representatives staff

packed the House Journal into an evacuation backpack and removed it from the Chamber. The House Journal is a large, heavy book in which the official record of proceedings of the House of Representatives is kept. The House Journal contains minutes of the proceedings and records objections, votes, motions, and other items. The House Journal is a necessary record for the House to record its proceedings, and the House Journal would have been required to be present if the House of Representatives reconvened its proceedings outside the House Chamber.

13.     In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

14.     Due to the dangerous circumstances presented by the assemblage of more than three people at the Capitol, who engaged in acts of violence that injured officers and damaged U.S. government property, D.C. Mayor Muriel Bowser instituted an emergency order and curfew on January 6, 2021, which stated in relevant part as follows:

> On January 6, 2021 protests transformed from peaceful to violent. Barricades at the Capitol were stormed and persons have entered the Capitol with the intent of disrupting proceedings. Protestors brought their own stink bombs and deployed them, sprayed pepper spray, and threw bricks, bottles, and bicycle racks at persons, including law enforcement officers. Both Capitol Police and Metropolitan Police Department officers have been injured. Bomb threats have been called in and shots have been fired at the Capitol.
> . . .
> I must now exercise my authority to impose a curfew, in order to protect the safety of persons and property in the District.

> By this Order, a second public emergency is declared in the District of Columbia, and a curfew is ordered for Wednesday night, January 6, 2021, continuing until the morning of January 7, 2020 [sic].

15.     Due to the curfew imposed, Safeway grocery stores in the District of Columbia suffered losses in sales, and shipments from their Pennsylvania facilities to their District of Columbia facilities plummeted. Therefore, the attack at the U.S. Capitol also adversely affected commerce within the District of Columbia.

16.     In addition, the United States Secret Service was forced to change its planned course of action in protecting protectee Vice President Mike Pence, who was evacuated from the Senate. Therefore, the attack at the U.S. Capitol also obstructed, delayed, and adversely affected the conduct or performance of a federally protected function, the Secret Service's protection of the Vice President.

17.     The attack at the U.S. Capitol was a "civil disorder" as defined in 18 U.S.C. § 232(1).

***Defendant Box's Conduct Prior to January 6, 2021***

18.     Prior to January 6, 2021, Dominic Box actively followed and discussed the results of the 2020 presidential election and the Electoral College vote count, which he knew was set to take place inside the United States Capitol building on January 6, 2021.

19.     For example, in late 2020, in one active Facebook chat group in which Box participated and which had approximately five to ten members, certain group members discussed their concerns regarding purported election fraud and the possibility of "saving" the election through the Electoral College vote process or, potentially, through violence. For example, on November 7, 2020, members of the group chat sent the following messages:

**Member 1:** "The media has convinced these people it's over. But it's not over until the senate ratifies it. And that won't happen until the Supreme Court hears it Jan 6"

**Member 1:** "They won't like it if it turns his way in the SC. And if it doesn't we're all going to have to fight against what is coming. So either way, a fight is coming."

. . .

**Member 1:** "I'm willing to wait and keep things peaceful until the courts decide. But if the fraud is not overturned in the courts we have to get out in the streets the same that they've been doing"

. . .

**Member 2:** "It's time to get ready. Give Trump time to do his thing but war is upon us. Best start considering CBs and walkie talkies to communicate with fellow patriots. 15% of this country is ready to fight now, another 10 will join with the starters and 5 to 10 % will join just because they don't want to be on the wong [sic] side you are looking at about 35% of people ready to overthrow the government in my opinion."

On the same day, Box messaged another Facebook user the following two messages, back to back: "Media doesn't decide the president" and "[T]hey[']re trying to incite a conflict[.]" Additionally, at another point that day, Box discussed "monitoring" the chat group members.

20.    About one month later, on December 8, 2020, Box and a Facebook friend exchanged messages, including:

- **Box:** "The media doesn't decide the President"

- **Box:** "[J]ust like they told u Russia collusion for four years"

- **Box:** "They're fucking criminals and lying"

- **Box:** "The electoral college hasn't even met yet"

- **Box:** "It's just sad they think people are too dumb to inform themselves"

- **Friend:** "When are they supposed to meet?"

- **Box:** "12/14"

- **Friend:** "So that's when we find out everything?"

- **Box:** "In a perfect world"

21.     On that same day, Box and other members of a Facebook chat group exchanged the following messages in the chat:

- **Member 1:** "Is the inauguration put off for right now? DUDE I KNOW!!! Everyone only listens to what the media says about Trump. My personal favorite is how they blame him for the border stuff and putting kids in cages WHEN THAT WAS OBAMA"

- **Box:** "It's not put off at all"

- **Box:** "I'll be there"

22.     On December 12, 2020, one group member in the same chat group asked, "Does anyone know if they can overturn the electoral college if they vote on the 14th?" Box responded, "They can challenge the electors[.]" He then posted Section 1(a) of then-President Trump's September 12, 2018 Executive Order on Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election, which explains the administrative process for conducting an assessment of any information indicating that a foreign government or agent acted with the intent or purpose of interfering in an election.

23.     On that same day, Box also encouraged a Facebook friend to go to Washington, D.C. on January 6 when the friend said she was tempted to go. In relevant part, the conversation went as follows:

- **Friend: "**Lol tempted to go"

- **Box: "**You should"

- **Box:** "No matter what happens"

- **Box:** "It will be historic"

- **Box:** "Likely biggest 'protest' ever"

  . . .

- **Box:** "We'll be all up in the action though. Recording and creating content"

24.    The "content" referenced above by Box referred to videos and pictures of his observations in Washington, D.C. on January 6, 2021, as Mr. Box had aspirations of one day becoming a well-known social media influencer, journalist, and political commentator.

25.    On December 19, 2020, Box messaged a Facebook friend a picture of a tweet from then-President Trump, which stated "[b]ig protest in D.C. on January 6th." Box then followed up with a message stating, "I'll be there[.]" He also provided a screenshot of the flights on January 5, 2021 and January 7, 2021, respectively, that he booked to travel from Georgia to D.C. for January 6.

26.    Similarly, on December 20, 2020, Box posted  "Stoked for DC on the 6th. Should be wild!" on Facebook, which mimicked President Trump's language in the above-noted December 19, 2020 tweet, which stated, "Big protest in D.C. on January 6th. Be there, will be wild!"

27.    As January 6, 2021 neared, Box continued sending links, articles, and making posts related to the presidential election and the Electoral College Vote. For example, on January 3, 2021, he sent a link on Facebook to an article from thehill.com entitled, "Vice President Pence's chief of staff said in a statement on Saturday that the vice president 'welcomes' an effort by lawmakers to 'raise objections' on Jan. 6, when Congress meets to certify the Electoral College vote." After sending the link, Box then said as follows on Facebook:

- "Pence responds"

- "Through an intermediary"

- "Much like Brennan"

28.     On January 4, 2021, Box exchanged text messages with a phone contact, "Rana," regarding his plan to fly "to DC [on January 6, 2021]" for the Electoral College Certification process.

### Box's Conduct on January 6 Prior to Entering the U.S. Capitol Building

29.     On January 6, 2021, Box attended President Trump's "Stop the Steal" rally at the Ellipse and listened to President Trump's speech. Box took videos and pictures of himself and the events around him as he made his way from the "Stop the Steal" rally at the Ellipse, into the restricted area on U.S. Capitol Grounds, and eventually into the Capitol building itself. He knew Vice President Pence was at the Capitol that day.

30.     One such video, which Box livestreamed to social media, captured Box after he attended the "Stop the Steal" rally and was walking with others to the U.S. Capitol, which he approached from the west side. In that livestream video, which was broadcast by the Savannah Freedom Exchange,[1] Box initially spoke into the camera, selfie-style, about going to the Capitol. He stated, "[Former] President Trump has called on everyone there to march down Pennsylvania Avenue. Well over 250,000 people headed towards the halls of Congress." Then, after flipping the camera around, Box, who was still livestreaming, continued as follows:

> I can confirm that we are all en route to Congress to the Capitol. I can't confirm that anybody has stormed the Capitol or broken in. But we're not there yet. We've heard reports of explosions and different things. That I have not heard or seen. But I don't know what you can do to stop a crowd this size with one thing on their mind.
>
> After hearing the President speak, specify the numbers and ways in which this election was stolen from us, I can definitely say I would rather be on this side than the other. There are some very rightfully disgruntled individuals here. Hand to hand

---

[1]     *See*   Savannah   Freedom   Exchange   Facebook   page, https://www.facebook.com/savannahfreedomexchange/ (last accessed April 24, 2024).

with cops? That I have not seen that. I would not be able to comment on that until I get up there.



*Images 1 and 2: Ex. 1 – Screenshots from Box's livestream video showing his path from the "Stop the Steal" Rally toward the restricted area within Capitol Grounds (timecode 0:00 – 3:22).*

Someone from the crowd walking near Box overheard Box and questioned aloud, "Hand to hand?"

31.     Before entering the U.S. Capitol building, Box observed police officers using pepper spray against individuals to try to deter individuals from getting closer to the inside of the Capitol building. But, rather than being deterred, Box stood near the bottom of the northwest staircases and began instructing other individuals about how to overcome the police's pepper spray. He yelled, "Get water on your bandana! Water on your bandana!" He hoped that these

instructions would permit individuals to withstand or at least attempt to withstand the effects of the pepper spray.



*Image 3: Ex. 2A – Screenshot from excerpted portion of HBO documentary "Four Hours at the Capitol," where Box, from near the base of the northwest stairs, instructed individuals on how to lessen pepper spray's effects.*



*Image 4: Ex. 3 – Open-source photo of Box near bottom of northwest stairs; Box is in the yellow box.*

32.     On January 6, 2021, the area next to the northwest stairs was an active worksite where preparations for the January 20, 2021 inauguration were ongoing. As Box climbed the northwest stairs and took in the sights, individuals nearby were actively ripping open the white tarp that covered the worksite's scaffolding, lifting bike rack barricades overhead to get them out of their way, and pushing back the small line of severely outnumbered Capitol Police officers that were attempting to keep individuals from advancing up the stairs.



*Image 5: Ex. 4 – Open-source photo of Box on northwest stairs;*
*Box circled in yellow.*

**Box's Conduct on January 6 – U.S. Capitol Building Entry**

33.     Then, after the crowd ahead of him successfully forced the police to retreat all the way up the northwest stairs, Box stood back and took video as other individuals successfully broke into the U.S. Capitol by shattering and climbing through windows adjacent to the Senate Wing

Door. As he watched the individuals shatter windows and climb into the building through them, he exclaimed, "We're fucking in… holy shit!" Then, he entered the Capitol through that door, the Senate Wing Door, at 2:14 p.m. He was among the first group of individuals to enter the building.



***Image 6: Exs. 5, 6 – Screenshot from Box's cell phone video of individuals climbing in in smashed windows next to Senate Wing Door.***



***Image 7: Ex.7 – Screenshot from CCTV footage showing Box videorecording his observations as he entered through Senate Wing Door; Box circled in yellow.***

*Box's Conduct on January 6 – Conduct in Crypt*

34.     Shortly thereafter, Box joined a crowd that overwhelmed officers and made its way into the Capitol's Crypt room in the basement level. As officers were forced to retreat from the arched doorway, Box shouted, "Don't fuckin' tread on us!" He then exclaimed, "Oh my God. Oh my God."



***Image 8: Ex. 8 – Screenshot from Box's cell phone video of mob pushing through outnumbered police line into Crypt (timecode 0:01-0:08, Box's voice heard at 0:07).***

35.     Less than a minute later, Box approached a Capitol Police officer who had been calling out to the crowd inside the Crypt. The officer was exclaiming things such as, "We don't need any more violence right now, all right? Calm down! We can just stand right here and talk it out, okay?" Box then approached the officer and shouted at him, "There's no talking, there's no fucking talking!"



***Images 9, 10: Ex. 9 – Screenshots from Box's cell phone video where he shouted at the officer
as that officer was engaging with crowd to "talk things out";
officer circled in blue (timecode 0:51-1:01, Box's voice heard at 0:56).***

36.     Box continued taking video as the Crypt was overrun by the mob. He proclaimed,

"This is awesome!" as he recorded the crowd flooding in and pushing the line of outnumbered

officers back.



***Image 11: Ex. 9 – Screenshot from Box's cell phone video of officers in Crypt being
overwhelmed by the mob (Box's voice heard at 0:12).***

37.     Testifying in the trial of another participant in the events of January 6, 2021 riot,

one U.S. Capitol Police Lieutenant who was present for the confrontation in the Crypt described

his experience as follows:

Q.     And what happened when you got into the crypt?

A.     Rioters already entered the building on the Senate side and were on the
       hallway on the – the north hallway coming towards the Crypt.

Q.     Did you try to stop rioters in that location?

A.     Yes. As they came down the hallway . . . we formed a police line, me and
       the other officers that were there formed a police line in the crypt to try to
       keep them from going any further.

       . . .

       There was a lot of yelling, screaming. Things were thrown at us. Eventually
       the mob pushed through the line, pushed people back. I was pushed into the
       hall and crushed into the wall to the point I couldn't breathe.

Q.     Were you scared?

A.     Yes.

Q.     What was going through your mind at that point?

A.     That my kids would be growing up without me.[2]

---

[2] *See United States v. Carpenter*, 21-cr-305 (JEB), Trial Tr. at 190:19-191:2, 192:23-193:9.

*Box's Conduct on January 6 – Facebook Livestream Inside Capitol*

38.     While inside the building, Box shared portions of his experience on Facebook. For example, at 2:30 p.m., he sent the following message in a Facebook chat group chat: "We are in the Capitol." He also livestreamed on Facebook certain portions of his time inside the building. In one Facebook livestream video, for example, Box filmed individuals as they went up a staircase to the Capitol's second floor. He then stated: "If you're watching this live, share right now! . . . Let's go!" Box also joined the crowd inside the Capitol as they chanted, "USA, USA . . . !" The following screenshot depicts a livestream video from Box, with his followers' reactions below.



***Images 12, 13: Ex. 1 – Screenshots from Box's livestream of cell phone video showing chanting inside the U.S. Capitol (timecode 3:22-4:37, Box's voice heard at 4:15).***

***Box's Conduct on January 6 – Multiple Exits and Re-Entries***

39.     Shortly after streaming the video of others walking up to the second floor of the Capitol, Box, who was still on the first floor, walked to the Memorial Door and exited the Capitol. He continued taking video as he exited. Moments later, though, he turned around and walked back inside the building behind a Capitol Police officer. While in the area in front of the internal glass doors that he was approaching, an officer told him, "You don't wanna be in here," to which Box responded, "Okay."





***Images 14, 15: Ex. 10 – Screenshots from Box's cell phone video as he left the building through the Memorial Door and then re-entering behind a Capitol Police officer.***

40.    Box then left through the Memorial Door for the second time at 2:37 p.m.



*Image 16: Ex. 11 – Screenshot from CCTV of Box exiting Capitol through Memorial Door (timecode 0:04).*

41.    Despite his prior exchange with the officer who told him, "You don't wanna be in here," Box re-entered the Capitol building a third time, this time through the East Rotunda Door around 3:04 p.m.



*Image 17: Ex. 12 – Screenshot from CCTV of Box videorecording his observations after he re-entered the Capitol through the East Rotunda Door (timecode 4:19); Box circled in yellow.*

42.     When Box re-entered the building through the East Rotunda Door around 3:04 p.m., that door had already been breached twice within the hour prior. Box went back outside shortly after re-entering, but then lingered just outside the East Rotunda Door as Capitol Police officers then briefly re-shut the doors around 3:08 p.m. (*see* Ex. 12 at approximately 1:30). After the officers fought a crowd of people to shut the doors again, Box stood right outside those doors and celebrated as the crowd began a "Whose house, our house!" chant.



***Image 18: Ex. 13 – Screenshot from open-source video of Box cheering just before the East Rotunda Door is again breached (timecode 3:03); Box identified by yellow arrow.***

43.     Approximately 30 seconds later, Box then re-approached the East Rotunda Doors, and reached out with his left hand toward the doors, which had smashed windows, as seen in the sequence of images below.









***Image 19: Ex. 13 – Screenshot from open-source video of Box extending his arm in the
direction of the East Rotunda Door and holding it open (timecode 3:29 – 3:31);
Box is identified by a yellow arrow, with his hand circled in yellow.***

44.     That same conduct is captured on CCTV video through the East Rotunda Door's

window, as seen in the sequence of images below. Once individuals successfully fought to open

the doors, Box yelled and gestured with his right hand, in which he held a water bottle.







***Images 20, 21, 22: Ex. 12 – Zoomed-in screenshots from CCTV showing Box reaching toward the East Rotunda Doors and holding one of the doors open (timecode 11:03-11:19); Box circled in yellow wearing yellow bandana.***

45.     Box then stepped to the side of the doorframe, pulled down his yellow bandana, turned toward the crowd and yelled, "We need more people!"



*Image 23: Ex. 14 – Screenshot from open-source video of Box standing next to the East Rotunda Door exclaiming (timecode 00:00 – 3:48, Box's exclamation at 2:48); Box is circled in yellow.*

**Box's Conduct on January 6 – Evening Facebook Activity**

46.     Around 8 p.m. on the evening of January 6, 2021, Box engaged with a Facebook chat group as follows:

- **Member 1:** "Alrighty so then @Bandon, you seemed to condemn the siege today. We tried it legally, we waited and waited, we turned up and voted yesterday … We lost many feel we were cheated. What are we supposed to do?"

- **Member 2:** "Take the loss . [sic] Like any other person with honor"

- **Box:** "If we were cheated, I don't know that there is honor in 'taking' it."

- **Member 3:** "So we are to wait 4 years while the presidential power is further expanded and unchecked in a completely liberal government?"

    . . .

- **Box:** "If this blatant fraud is allowed to stand & happen I don't even know what to think"

*Box's Conduct after January 6*

47.     On January 7, 2021, the Facebook chat group had the following exchange:

- **Member 1:** "Honestly, We should all consider moving any political conversations off of Facebook's platform in onto a truly encrypted app like signal or something. Facebook is monitoring everything and I don't trust them at all."

- **Member 2:** "Signal is what I use"

- **Box:** "I'm on Signal."

48.     Then, on January 11, 2021, Box and a Facebook friend exchanged the following messages:

- **Box:** "Yo I'm all good"

- **Box:** "Just laying low"

- **Friend:** "Why?? What happened"

- **Friend:** "Obviously something big if you're laying low"

49.     On January 12, 2021, a Facebook user messaged in a Facebook group chat, "Has anyone heard from @Dominic Box are you okay?" Minutes later, Box replied as follows:

- **Box:** "Hey guys, I'm all good"

- **Box:** "Just letting the media storm die out."

- **Box:** "And I know you all don't know me well, but I hope you know I would never be involved in any vandalism or violence. My presence was strictly as a citizen Journalist & I documented everything. That's it."

50.     On January 14, 2021, in a Facebook chat group discussion, one group member asked, "But is there any scenario where the plan Q [referring to Qanon] talks about happens after Biden's inauguration? Or is it all or nothing starting with in the next 5 days?" The conversation then continued as follows:

- **Box:** "Did you read what I wrote"

- **Box:** "Biden will not be inaugurated"

51.     Box then appears to have deactivated and reactivated his Facebook account on the following dates (as measured in Eastern Standard Time): January 10, 2021; January 14, 2021; February 22, 2021; and July 4, 2023.

52.     On February 10, 2021, the Federal Bureau of Investigation ("FBI") did a knock-and-talk at Box's residence, where Box gave a voluntarily interview regarding his conduct on January 6. In the interview, Box admitted to certain conduct, such as his presence within the restricted area and the Capitol building on January 6, but was not forthcoming about the tone of some of his interactions with law enforcement that day. The day after the knock-and-talk, Box voluntarily provided the FBI with certain videos and pictures he took on January 6 and the text message chain referenced above in paragraph 28. After February 2021 and until Box's arrest, the FBI and Box remained in contact as to Box's whereabouts, among other things.

53.     Sometime before October 2021, Box agreed to be interviewed for the HBO documentary "Four Hours at the Capitol." In the documentary, he acknowledged his presence in and around the U.S. Capitol on January 6, 2021. When describing when he first arrived at the Capitol and was looking out at individuals making their way toward the Capitol and the city in the background, Box stated as follows: "As I'm going up the scaffolding and getting to the steps, there was a kid who probably captured the emotions I was having. I don't even know what the emotions—I mean I wa—I was proud to see the American spirit that was on display." *See* Ex. 2B.

## III.     The Offenses.

54.     With respect to Count One, Box reserves the right to appeal if the Court finds sufficient facts to convict him under the current interpretation of the statute as set forth in *United*

*States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 2003 WL 8605748 at *1 (U.S. Dec. 13, 2023) (No. 23-5572), and *United States v. Robertson*, No. 22-3062 (D.C. Cir. Oct. 20, 2023). Box agrees that, without waiving any arguments as to Count One set forth in his Motion to Dismiss*, if the Court finds the existence of these facts beyond a reasonable doubt, this evidence would establish each and every element of Count One beyond a reasonable doubt under the D.C. Circuit's current interpretation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2. Specifically, for the purposes of this proceeding and without waiving the arguments raised in his Motion to Dismiss, the defendant admits as follows: (1) he attempted to or did obstruct or impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the U.S. Constitution and 3 U.S.C. §§ 15-18; (2) he intended to obstruct or impede the official proceeding; (3) he acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; (4) he acted corruptly, which is defined as using unlawful means, in pursuit of an unlawful purpose, and with consciousness of wrongdoing. Box also admits he willfully and knowingly entered the U.S. Capitol knowing that that he lacked permission to do so, and that, as part of his effort, he engaged in an act of civil disorder, in violation of 18 U.S.C. § 231(a)(3). None of the foregoing should be construed in any way as a waiver by Box of his right to appeal a conviction under Count One based on the arguments raised in his Motion to Dismiss.

55.     With respect to Counts 2 through 7, the parties agree that, if the Court finds the existence of these facts beyond a reasonable doubt, this evidence would establish each and every element of Counts 2 through 7.

---

\* Where the materials refer to Box's Motion to Dismiss, this reference includes Box's Motion to Dismiss Count One of the Indictment and any replies and notices of supplemental or additional authority he may file.

56.     With respect to Counts Two and Three, the defendant further admits that, on January 6, 2021, at the U.S. Capitol, he knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with U.S. Capitol Police Officers in/near the Crypt room of the U.S. Capitol Building (Count Two) and in/near the East Rotunda Door of the U.S. Capitol Building (Count Three). Specifically, he admits that he joined a group of individuals who pushed through officers at the entryway to the Crypt, while he shouted, "Don't fucking tread on us!" Then, he approached up to an officer who was asking the crowd to "talk it out," and shouted at that officer, "There's no talking! There's no fucking talking!" He was then a part of the group that overwhelmed the Crypt officers. The defendant further admits that later, when officers were attempting to keep the East Rotunda doors shut, he ignored their orders and when instead he stood outside the doors, reached towards them, and helped hold open one of the doors. Around that time, he also yelled out into the crowd, "We need more people!" At the time the defendant did these acts, these officers were engaged in the lawful performance of their official duties incident to and during a civil disorder. The civil disorder obstructed, delayed, or adversely affected commerce and the movement of any article or commodity in commerce; for example, by causing the early closure of Safeway stores, resulting in reduced revenue; and the conduct or performance of a federally protected function, including the protection of former Vice President Michael Pence by the U.S. Secret Service and the U.S. Capitol Police's protection of the Capitol.

57.     If the Court finds the existence of these facts beyond a reasonable doubt, the defendant, Dominic Box, stipulates that this evidence would establish each and every element of Counts Two and Three of the Superseding Indictment beyond a reasonable doubt.

58.     With respect to Count Four, the defendant further admits that, on January 6, 2021,

at the U.S. Capitol, he entered or remained in a restricted building or grounds without lawful authority to do so, and, that he did so knowingly. For example, on Capitol's west side, the defendant entered the restricted area with knowledge that he lacked authority to do so. He then proceeded to enter the Capitol Building three times despite knowing that he was not allowed to enter the building.  He further admits that he knew that Vice President Pence was going to be at the Capitol that day to preside over the Certification of the Electoral College Vote.

59.     If the Court finds the existence of these facts beyond a reasonable doubt, the defendant, Dominic Box, stipulates that this evidence would establish each and every element of Count Four of the Superseding Indictment beyond a reasonable doubt.

60.     With respect to Count Five, the defendant further admits that, on January 6, 2021, at the U.S. Capitol, he engaged in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds; that such conduct occurred when, or so that, such conduct, in fact, impeded or disrupted the orderly conduct of Government business or official functions; and, that he did so knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions. Specifically, the defendant admits that the conduct that satisfies Counts Two and Three also satisfies Count Five with respect to the defendant's conduct in the Crypt and near the East Rotunda doors, and that he engaged in this conduct to disrupt Government business and official functions including Congress's Certification of the Electoral College Vote and the Capitol Police's protection of the Capitol.

61.     If the Court finds the existence of these facts beyond a reasonable doubt, the defendant, Dominic Box, stipulates that this evidence would establish each and every element of Count Five of the Superseding Indictment beyond a reasonable doubt.

62.     With respect to Count Six, the defendant further admits that, on January 6, 2021,

he engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; he did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and, he acted willfully and knowingly. Specifically, the defendant admits that the conduct that satisfies Counts Two and Three also satisfy Count Six with respect to the defendant's conduct in the Crypt and near the East Rotunda doors, and that he engaged in this conduct willfully and knowingly in order to impede, disrupt, or disturb Government business and official functions including Congress's Certification of the Electoral College Vote and the Capitol Police's protection of the Capitol.

63.    If the Court finds the existence of these facts beyond a reasonable doubt, the defendant, Dominic Box, stipulates that this evidence would establish each and every element of Count Six of the Superseding Indictment beyond a reasonable doubt.

64.    With respect to Count Seven, the defendant further admits that, on January 6, 2021, he paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and, he acted willfully and knowingly. Specifically, the defendant admits that the conduct that satisfies Counts Two and Three also satisfy Count Seven with respect to the defendant's conduct in the Crypt and near the East Rotunda doors. He further admits that he acted willfully and knowingly; for example, knew he was not permitted to enter the Capitol Building but did so anyway as part of the crowd, and he knew that he was not allowed to push past police lines.

65.     If the Court finds the existence of these facts beyond a reasonable doubt, the defendant, Dominic Box, stipulates that this evidence would establish each and every element of Count Seven of the Superseding Indictment beyond a reasonable doubt.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Samantha R. Miller
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, D.C. 20001
Samantha.Miller@usdoj.gov

### DEFENDANT'S ACKNOWLEDGMENT

I, Dominic Box, have read this Statement of Facts for Stipulated Trial and have discussed it fully with my attorney. I fully understand what is set forth in this document. I agree and acknowledge by my signature that this Statement of Facts for Stipulated Trial is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Facts for Stipulated Trial fully.

Date: 5/1/2024

DOMINIC BOX
Defendant

### ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Facts for Stipulated Trial and have reviewed it with my client, Dominic Box, fully.

Date: 5/1/2024

AMY C. COLLINS
Attorney for Defendant

Page 37 of 37

# **Attachment B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-CR-413-CKK** |
| | : | |
| **v.** | : | **18 U.S.C. §§ 1512(c)(2), 2** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **18 U.S.C. §§ 1752(a)(1), (a)(2)** |
| **DOMINIC BOX,** | : | **40 U.S.C. §§ 5104(e)(2)(D), (G)** |
| | : | |
| **Defendant.** | : | |
| | : | |

## AGREEMENT AND WAIVER OF JURY TRIAL RIGHTS

Defendant Dominic Box, by and through counsel, hereby acknowledges that he waives the following rights by proceeding with a Stipulated Trial:

1.  The constitutional right to trial by jury.  At a trial, the government would have to present evidence to prove the defendant's guilt beyond a reasonable doubt.

2.  The right to cross-examine witnesses presented by the government and the right to have witnesses called to court to testify on behalf of the defendant.

3.  The right to counsel to assist the defendant at trial.

4.  The right to testify if the defendant chose to do so. However, if the defendant chose not to testify, the Court would instruct the jury that the decision could not be used against the defendant.

5.  At a jury trial, the defendant could not be convicted unless all 12 jurors agreed that the government had proved the defendant's guilt beyond a reasonable doubt.

6.  The defendant understands and acknowledges that if he is not a citizen of the United States, his conviction could result in his deportation or have other immigration consequences.

If the Court grants leave to proceed with a Stipulated Trial, you will give up these rights. The government agrees that proceeding with a Stipulated Trial will not curtail, abridge, or otherwise affect your right to appeal the Court's denial of your motion to dismiss Count 1, which charges a violation of 18 U.S.C. §§ 1512(c)(2), 2.  The Court will consider the Statement of Facts and if it believes that the government has proven your guilt beyond a reasonable doubt, the Court will find you guilty.  Your signature means that you wish to proceed by a Stipulated Trial and give up those rights.

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that you clearly demonstrate acceptance of responsibility, to the satisfaction of the Government, by agreeing to all provisions in the Stipulated Facts, not contesting guilt at the trial, and by your conduct between entry of the plea and imposition of sentence.  Furthermore, assuming you have accepted responsibility as described in the previous sentence, the Government agrees that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because you have assisted authorities by providing timely notice of your intention to enter into a fully stipulated trial and not contest guilt at the trial, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should the defendant move to withdraw his agreement to the stipulated trial  after

it occurs, or should it be determined by the Government that you have either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

DOMINIC BOX

DATE 5-12-24

AMY C. COLLINS
Counsel for Dominic Box

DATE 5/12/2024

3